UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO.

KATHRYN KAETHER as personal
representative of the Estate of
WILLIAM HERRING Jr., Deceased,
KATHRYN KAETHER and
WILLIAM HERRING, Sr.,
as mother and father of Deceased.

       Plaintiffs,

v.

ARMOR CORRECTIONAL HEALTH SERVICES, INC.,
a Florida corporation, and;
SCOTT ISRAEL, in his official capacity
as Sheriff of Broward County, Florida, and;
STANLEY FRANKOWITZ D.O. individually
and as a doctor employed by ARMOR
CORRECTIONAL HEALTH SERVICES, INC., and;
JOHN MARTIN M.D. individually and as a doctor
employed by ARMOR CORRECTIONAL HEALTH
SERVICES, INC.

Defendants.

_____/

## COMPLAINT

      The Plaintiff, KATHRYN KAETHER, as personal representative of the Estate of

WILLIAM HERRING Jr., Decedent, on behalf of herself and William Herring, Sr., as

mother and father of WILLIAM HERRING Jr., sue Defendants, jointly and severally,

and allege:

## PRELIMINARY STATEMENT

1)   In the two years before William Herring Jr., (HERRING) starved to death in the

1

Broward County jail five other men died slow, horrible and preventable deaths in the same jail. During this two year period Defendant, Armor Correctional Health Services, Inc., (ARMOR) collected over 50 million dollars from the taxpayers of Broward County. ARMOR had signed a contract with the Sheriff of Broward County promising to provide comprehensive healthcare to every inmate in the jail. However, instead of holding true to its promise ARMOR chose to maximize profits. ARMOR knew that the result of putting profits before patients would be that some inmates with serious medical conditions would not get the care that they were entitled to and other inmates would not be transferred to outside hospitals when it was medical necessary. The result of ARMOR'S decision was that ARMOR made money but the following people needlessly died:

a)   On February 17, 2011, William Campbell, who had been arrested for DUI, died of sepsis. ARMOR conducted an internal investigation into Mr. Campbell's death and found ARMOR'S medical staff had provided substandard care, that Mr. Campbell was in shock in the days prior to his death, that the decision not to send him to the hospital was incorrect, and that if he would have been sent to the hospital in a timely manner and without the medically unjustified delay he would not have died.

b)   On October 10, 2011, Gary Joseph Smith, who had been arrested for possession of cocaine, died of pneumonia. ARMOR again conducted an investigation and found that ARMOR'S employees failed to properly monitor Mr. Smith, who was seriously ill, and failed to treat his severe dehydration.

c)   On January 3, 2012, Calvin Goldsmith, who had been arrested for trespassing, died of sepsis. ARMOR conducted an investigation and found that in the days prior to his

2

death that Mr. Goldsmith had become so sick that he fell in his cell fracturing his skull and lacerating his head and face, that he became dehydrated and was found lying in his own feces, that he was hypotensive (had dangerously low blood pressure), that he was nonverbal and was only making moaning and gurgling sounds, and that ARMOR'S staff was aware of this and it appears that little was done.

d)   On February 6, 2012, Raleigh Priester, a severely mentally ill man, was arrested for throwing a rock at a city employee.  On July 10, 2012, Mr. Priester was found dead in his cell.  He had lost 120 pounds during his 155 days in jail and died from starvation. During Mr. Priester's time in the jail he was largely ignored by ARMOR'S medical staff and was not transferred to the hospital when it was clearly medically necessary. Even though ARMOR'S medical staff was aware that he was psychotic he was not given anti-psychotic medication.  He urinated blood for weeks, did not eat, and stood naked in his cell for days banging his head into the wall until he bled.

e)   On June 21, 2012, Arthur Sacco, was arrested for a misdemeanor.  After his arrest, but before he was booked into the Broward County jail, Mr. Sacco spent three days at Memorial Hospital as a Baker Act.  Mr. Sacco was released from the hospital in good health and brought directly to the jail.  By the morning of July 4, 2012, Mr. Sacco's medical condition had deteriorated to the point that he was too weak to stand or use the toilet on his own. He was found, in his cell, covered in vomit and diarrhea. From that point Mr. Sacco's health steadily deteriorated as ARMOR'S medical staff stood by and watched Mr. Sacco's slow, painful and foreseeable march to his death. ARMOR'S medical staff failed to send Mr. Sacco to the hospital, despite obvious signs of an

infection, and on July 7, 2012, Mr. Sacco died from sepsis. After Mr. Sacco's death ARMOR conducted an investigation and concluded that, "perhaps he [SACCO] could have been sent to the hospital sooner".

## JURISDICTION

2)      This action is brought pursuant to 42 U.S.C. §1983, and the Fourteenth Amendment to the United States Constitution as WILLIAM HERRING, Jr., (hereinafter HERRING) was a pretrial detainee at all relevant times.  Jurisdiction is based upon 28 U.S.C. §1331, §1343, and 42 U.S.C. §§ 1983, 1988, the constitutional provisions mentioned above.

3)      It is alleged that the federal violations were committed as a result of the deliberate indifference of all of the Defendants.

4)      The acts and practices constituting the violations alleged below have occurred within the jurisdiction of the United States District Court in and for the Southern District of Florida. In connection with the acts, practices and violations alleged herein, each Defendant has, directly or indirectly, violated the constitutional rights of HERRING.

5)      All conditions precedent under Florida law to the filing of this lawsuit have been satisfied.

6)      The above listed Plaintiffs, through HERRING'S Personal Representative, Kathryn Kaether, seek an award of damages for mental and emotional injuries, funeral expenses, punitive damages, court costs and attorney fees on behalf of the above listed survivors.  Kathryn Kaether, as HERRING'S Personal Representative, also makes a claim for survival damages pursuant to Section 46.021, Florida Statutes, as HERRING

suffered past physical, mental, emotional pain and suffering, disfigurement and loss of enjoyment of life when he was held in the Broward County Jail.

**PARTIES**

7)      HERRING and his Personal Representative, at all times material hereto, have been residents of Broward County, Florida.

8)      The Defendant, SCOTT ISRAEL, (hereinafter ISRAEL) is the Sheriff of Broward County.  Said Defendant is responsible, as Sheriff, for the conduct of ARMOR as he has retained ARMOR to provide medical care for all inmates in the Broward County Jail. ISRAEL is also responsible, as Sheriff, for the conduct of all deputies and/or corrections officers in his employ and ensuring that his deputies, corrections officers, employees, servants and agents obey the laws of the State of Florida and the United States.  Said Defendant is being sued in his official capacities.

9)      The Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., (hereinafter ARMOR) is a Florida Corporation, organized and existing under the laws of the State of Florida, conducting business in Broward County, Florida.

10)      The Defendant STANLEY FRANKOWITZ D.O. (hereinafter FRANKOWITZ) at all times material herein, was employed by and serving under Defendant ARMOR. Said Defendant is being sued in his individual capacity.

11)      The Defendant JOHN MARTIN M.D. (hereinafter MARTIN) at all times material herein, was employed by and serving under Defendant ARMOR.  Said Defendant is being sued in his individual capacity.

12)      At all times material hereto, and in all their acts described herein, the

Defendants were acting under color of state law and color of their authority as public officials and public employees of the State of Florida.

13)      The wrongful actions of the Defendants constitute deliberate indifference to HERRING'S serious medical condition and caused his death.

## ALLEGATIONS OF FACTS

14)      On October 26, 2012, the Plaintiff, HERRING, was booked into the Broward County Jail.  He was 22 years old at the time.  At intake HERRING was identified as being mentally ill and was immediately placed on suicide watch.  As part of the suicide watch protocol HERRING was stripped naked, given a large thick vest to cover his body and placed in a small single cell with a door that remained closed and locked 23 hours per day.

15)      During the intake process on October 26, 2012, HERRING explained to the ARMOR medical provider that he fasting and would not eat, drink or take any medication because that is what God asked of him.  HERRING also disclosed that he was bipolar; not taking his medication and that he had recently been hospitalized for mental health reasons.

16)      On October 28, 2012, HERRING was seen by Defendant FRANKOWITZ. Defendant FRANKOWITZ started a patient "hunger strike log" because HERRING was refusing to eat or drink anything.

17)      From October 26th to October 29, 2012 the ARMOR medical records show that HERRING spent his days either rocking back and forth on his bunk naked or walking around his cell naked.  HERRING consistently refused food and liquids explaining that he was not suicidal but that he was not eating or drinking for religious reasons.

18)      On October 29, 2012, Defendant MARTIN examined HERRING and recorded that HERRING was not eating or drinking and that he appeared to be responding to internal stimuli. (i.e. HERRING was actively hallucinating).

19)      On October 30, 2012, Defendant MARTIN ordered that HERRING be moved to a Baker Act facility because he found that, "there is a substantial likelihood that without care or treatment HERRING will cause serious bodily harm to himself in the near future, as evidenced by recent behaviors such as refusing mental health treatment, refusing to eat, being actively psychotic and being unable to care for himself as evidenced by refusing to wear clothes".

20)      On November 1, 2012, according to ARMOR'S medical records HERRING was still in his suicide cell, still psychotic and still without any medication for his mental illness.

21)      On November 2, 2012, Defendant MARTIN again saw HERRING, who was still on suicide watch clothed only in his suicide vest and still locked down 23 hours per day in a cell alone.  Defendant MARTIN was aware that HERRING was still psychotic, not eating and still unmedicated.  Defendant MARTIN made no effort to medicate HERRING or have him moved to an outside hospital that could have provided the level of care that HERRING required.

22)      On November 2, 2012, Broward Circuit Court Judge Singhal entered an order directing ARMOR and the Sheriff to immediately have HERRING seen by the psychiatric staff to determine the need for medication.  Judge Singhal wrote ASAP at the end of the order.  This order was ignored by all the Defendants.

23)      On November 4, 2012, ARMOR employee Ouida Strong filled out an urgent clinical referral for HERRING because HERRING had not eaten in two days and stated

7

that God will tell him when to break his fast.  Ms. Strong requested that HERRING be seen ASAP.

24)      On November 6, 2012, ARMOR employee Sergey Istomin documented that she had been told by a Sheriff's Deputy that HERRING had been refusing food and water for eight days.  When Ms. Istomin met with HERRING she found him lying naked in his cell.  Ms. Istomin documented that HERRING was disoriented, had poor hygiene, lacked insight or judgment.  Her plan was to rule out bipolar disorder and continue suicide watch.

25)      On November 7, 2012, Defendant MARTIN again examined HERRING.  Defendant MARTIN documented that HERRING was refusing food and water.  Defendant MARTIN recorded in the section of the form titled "suicidal" that HERRING was not taking any liquids or solids.  Defendant MARTIN again failed to medicate HERRING or have him transported to a facility that could properly treat him and instead documented that his plan was to continue suicide watch, rule out psychotic disorder and follow-up in 24 hours.

26)       On November 8, 2012, Defendant MARTIN examined HERRING again.  Defendant MARTIN recorded that HERRING was still not eating or drinking and therefore Defendant MARTIN recorded that he would consider Baker Acting HERRING.  However, Defendant MARTIN failed to do anything and HERRING remained unmedicated, psychotic and still refusing food and water.

27)      On November 8, 2012, HERRING'S medical records show that he had a conversation with a Sheriff's Deputy and when the Deputy attempted to get HERRING to take some fluids HERRING started calling her the devil.  The records show that HERRING was being monitored for severe dehydration and that his skin tugor was

8

decreasing, indicating that he was severely dehydrated.

28)      On November 8, 2012, HERRING was examined by Defendant
FRANKOWITZ.   Defendant FRANKOWITZ documented that HERRING had not
consumed food or water for many days and that HERRING stated that he was fasting for
spiritual reasons.   FRANKOWITZ found that HERRING was severely dehydrated and
malnourished.   However, Defendant FRANKOWITZ failed to take any action.   He failed
to medicate HERRING or have him sent to an outside hospital that could care for his
serious medical conditions.

29)      Late on November 8, 2012, HERRING collapsed in the jail and was
transported by EMS to the emergency room at North Broward Medical Center.   On intake
at the hospital HERRING'S blood was drawn and he was found to be severely
dehydrated.   The hospital started IV therapy to stabilize him.   In addition, HERRING was
seen by a psychiatrist who immediately identified HERRING as being severely mentally
ill and in need of treatment.   This psychiatrist quickly Baker Acted HERRING and began
to give him Haldol injections to treat his psychosis.

30)      HERRING remained in the hospital for six days while he was stabilized, his
severe dehydration was treated with an IV, and his mental illness was treated with Haldol
injections.

31)      When HERRING was discharged on November 13, 2012, the doctor at the
hospital spoke to Defendant FRANKOWITZ and the Sheriff's Deputy who was with
HERRING at the hospital and instructed them both that HERRING should NOT be
returned to the jail but instead brought to psychiatric hospital for further care.

32)      However, Defendant FRANKOWITZ, Defendant MARTIN, the Sheriff's
Deputy and the rest of ARMOR'S medical providers choose to ignore the explicit

9

directions of the doctor who was treating HERRING at the hospital and they brought HERRING back to the jail, and although ARMOR'S records show that HERRING was too weak to stand, they stripped him naked again, gave him a suicide vest to cover himself and locked him in a suicide cell alone.  In addition to ignoring the directions to place HERRING in a psychiatric hospital and not in the jail Defendant FRANKOWITZ, MARTIN and ARMOR's other medical providers also choose not follow the hospital's discharge instructions regarding medication for HERRING.  The hospital had discharged HERRING on Haldol for his mental illness and ordered that he be treated for his mental illness.  However, Defendant FRANKOWITZ, MARTIN and ARMOR'S other providers choose not to give HERRING the Haldol as ordered or give HERRING any medication for his mental illness.

33)      On November 14, 2012, HERRING was examined by Defendant MARTIN who recorded that HERRING was lying naked on his bunk and had just been returned from the hospital where he was treated for severe dehydration.  MARTIN documented that HERRING was still refusing to eat or drink anything and that when HERRING was in the hospital he was given Haldol but that he is currently not being treated with Haldol in the jail.  Defendant MARTIN'S plan, according to his own notes, is that HERRING will be going to court in two days and Defendant MARTIN is hoping that the Judge will Baker Act him at that point.  Defendant MARTIN is clearly aware of HERRING'S serious medical conditions and that HERRING is in need of treatment and should be transferred to an outside hospital.  However, Defendant MARTIN makes no effort to provide any care or have HERRING transferred to an outside hospital that can provide the level of care that HERRING needs.

34)      On  November  14,  2012,  HERRING  was  examined  by  Defendant

FRANKOWITZ.  Based on Defendant FRANKOWITZ'S own notes he is aware that: HERRING is currently not eating or drinking; that HERRING was just released from the hospital after a six day stay; that HERRING was in the hospital because he had become critically dehydrated from not eating or drinking; that the discharge instructions were to have HERRING moved to a psychiatric hospital and to continue him on his previously ordered Haldol.   However, Defendant FRANKOWITZ does nothing.   He allows HERRING to remain acutely psychotic, unmedicated and not taking in fluids knowing that not treating this serious medical condition will result in HERRING'S death.

35)      On November 15, 2012, Defendant MARTIN again examines HERRING and he documents that HERRING is lying on his bunk; he will not respond to his questions; he is still refusing his meals and is responding to internal stimuli – meaning that HERRING is hallucinating.  Defendant MARTIN writes his plan is that HERRING is going to court tomorrow and that, "perhaps the Judge will Baker Act him to a facility where he can be treated medically and psychiatrically".  However, Defendant MARTIN, a doctor who can order that HERRING be medicated or that HERRING be immediately Baker Acted HERRING or order that HERRING be transferred to facility that can care for him fails to do anything and allows HERRING to suffer and become more dehydrated.

36)      On November 16, 2012, at about five in the morning, Defendant MARTIN again examines HERRING and finds him lying naked on bunk and not responding to his questions.  Again Defendant MARTIN fails to act even knowing that in past 24 hours since he last saw him HERRING has not moved from his bunk and not consumed any food or water.

37)      On November 16, 2012, HERRING collapses when he is being transported to

court.  HERRING stops breathing and blood does not get to HERRING'S brain for a significant time.  HERRING is transported to Broward General Medical Center where he is found to be severely dehydrated and is exhibiting almost no brain activity.

38)	For the next five weeks HERRING's mother and father sit by the bedside of their 22 year-old son as he struggles for his life on a ventilator.  At one point HERRING gives a "thumbs-up" when his mother asks him to give her a thumbs-up if can hear her.  Besides this brief glimpse of hope HERRING'S brain never recovers.

39)	After five weeks of sitting with their son day and night HERRING'S mother and father, based on the doctor's advice, make the decision to remove the life support and see if HERRING can survive on his own.  But HERRING does not survive and on December 22, 2012, William Herring, Jr. died and his parents donated his organs.

40)	The Broward County Medical Examiner conducted and autopsy and concluded that HERRING'S death was caused by complications of electrolyte imbalance due to prolonged fasting.

## THE PRIOR INMATE DEATHS IN THE BROWARD COUNTY JAIL THAT SHOW ARMOR'S PATTERN

**William Campbell:**

41)	On February 5, 2011, William Campbell was arrested for DUI. He was booked into the Broward County Jail and evaluated by ARMOR'S medical staff.

42)	On February 6, 2011, at 10:00 A.M. William Campbell became hypotensive with a blood pressure of 63/37. Defendant FRANKOWITZ was contacted, made aware of this serious medical condition and failed to have Mr. Campbell transported to the hospital when hospitalization was clearly necessary due to a medical emergency.

12

43)       On February 6, 2011, at 4:00 P.M. William Campbell was found on the floor and incontinent of feces. Mr. Campbell was evaluated at this time by ARMOR employee Pat Janis and found to still be hypotensive with a blood pressure of 75/47, a fever of 102.5, a pulse of 106 with increasing ataxia (the loss of full control of bodily movements) and confusion.

44)       On February 7, 2011, at 8:00 A.M. William Campbell was evaluated by Defendant FRANKOWITZ and transferred to the hospital where he later died.

45)       An autopsy was conducted and the medical examiner concluded that, "sepsis was a factor contributory to death".

46)       On February 22, 2011, ARMOR drafted a three page document called a "Mortality or Morbidity Review".    This review outlines the medical care that was provided and memorializes ARMOR'S conclusions regarding whether the medical care was appropriate.  In the case of William Campbell, ARMOR concluded that the,

> "Patient's vital signs and conditions were deteriorating. He was in early shock with symptoms consistent with SIADH Na+119. IV fluid and p.o. antibiotics were not appropriate amount or route to arrest deterioration. **Decision to obtain higher level of care was delayed at least 24 hours**."

47)       The Mortality or Morbidity Review relating to William Campbell was reviewed at a meeting on February 23, 2011, that was attended by ARMOR'S regional vice president, Health Services Administrator, medical director and director of nursing as well as eight other high-ranking ARMOR employees among others. Therefore, ARMOR, through its policymakers was aware of the problems outlined above in the care of William Campbell including that the decision to transfer him to an outside hospital was delayed at least 24 hours but ARMOR failed to take any corrective action to prevent

13

future deaths.

**Gary J. Smith:**

48)      On August 4, 2011, Gary Smith was arrested for possession of cocaine and booked into the Broward County Jail. ARMOR though its employees discovered that Mr. Smith had full-blown AIDS with a CD4 of 136 and viral load of 300,000. However, ARMOR made no attempt to place Mr. Smith on any kind of antiretroviral medication that would have decreased his viral load and increased his CD4. As expected Mr. Smith's health deteriorated and he was moved to the infirmary after an acute episode of shortness of breath. Instead of transferring Mr. Smith to an outside hospital for care and treatment of his serious medical conditions, ARMOR kept Mr. Smith inside the jail infirmary where he became dehydrated and suffered from acute renal failure with metabolic encephalopathy.

49)      On October 8, 2011, Gary Smith, while in the infirmary, became incontinent of urine and had persistent garbled speech. ARMOR'S medical personnel were aware of the medical history as outlined above but still ignored a clear medical emergency and failed to transport Mr. Smith to an outside hospital that could have provided the level of care that he needed.

50)      On October 9, 2011, at 5 P.M. Gary Smith deteriorated to the point where he became unresponsive. Mr. Smith was transported to the hospital where he coded before he could be admitted into the Intensive Care Unit. Mr. Smith was revived by the hospital medical personnel and placed on a ventilator.  On October 10, 2011, Mr. Smith coded again and was not able to be revived. His time of death was 7:52 AM on October 10,

2011.

51)        An autopsy was conducted and the cause of death was acute lobar pneumonia

with a clinical history of low CD4 count and acute renal failure and dehydration.

52)        ARMOR drafted a "Mortality or Morbidity Review" related to Gary Smith and

found that as Mr. Smith became more dehydrated, a more aggressive rehydration

treatment was necessary, but not provided.   ARMOR'S regional vice president, medical

director, director of nursing and the Broward Sheriff's Office Captain Callaghan and nine

other high-ranking ARMOR employees reviewed this report on January 11, 2012 and

therefore ARMOR was aware of constitutional deficiencies in Mr. Smith's care but failed

to make any changes to prevent this type of unnecessary death from recurring in the

future.

53)        Gary Smith's medical treatment was reviewed by Dr. Arthur Fournier,

Professor Emeritus, Department of Internal Medicine at the University Of Miami School

Of Medicine. Dr. Fournier found the care provided to Gary Smith and the decision not to

have him transferred to an outside hospital prior to his death were actions grossly

contrary to accepted medical practices.

**Calvin Goldsmith:**

54)        On December 18, 2011, Calvin Goldsmith was arrested for trespassing and

booked into the Broward County Jail.

55)        On December 22, 2011 Calvin Goldsmith became critically ill and fell in his

cell several times striking his head, causing several facial lacerations. ARMOR personnel

moved Mr. Goldsmith to the infirmary where he became agitated and critically

hypotensive (low blood pressure).

56)      According to ARMOR'S medical records over the next few days   Mr.
Goldsmith's continued to deteriorate and on December 24, 2011, he was found in his cell,
lying on the floor too weak to move and covered in feces.  Defendant FRANKOWITZ
was notified and apprised of the situation. Faced with this clear medical emergency of a
man deteriorating and dying in their infirmary ARMOR through its employees, including
Defendant FRANKOWITZ, failed to transfer Mr. Goldsmith to the hospital when it was
clearly necessary and obvious that he required emergency medical care.

57)      On December 26, 2011, two days after Mr. Goldsmith was found lying on the
floor in his own feces to weak and sick to move, he was reevaluated by ARMOR'S
medical personnel and found to be moaning, gurgling, dehydrated and in shock. He was
then transferred to the hospital where he died.

58)      An autopsy was conducted and the medical examiner ruled the cause of death
to be sepsis due to a perforated diverticula.

59)      ARMOR conducted a "Mortality or Morbidity Review" relating to the death of
Calvin Goldsmith and concluded that Mr. Goldsmith was suffering from decreasing
blood pressure, altered mental status, was moaning and that the provider
(FRANKOWITZ) was aware of this and it appears that nothing was done. The medical
care of Mr. Goldsmith and the "Mortality or Morbidity Review" was discussed at
meeting held on January 11, 2012 – the same day that the same group reviewed the
"Mortality or Morbidity Review" for Gary Smith as outlined in paragraph 52 above.  This
meeting was attended by ARMOR'S regional vice president, medical director, director of
nursing, health services administrator and five other high-ranking ARMOR employees.

Therefore, ARMOR was aware of the constitutional deficiencies in the care of Mr. Goldsmith and even with this knowledge failed to make any changes that would prevent unnecessary deaths in the future.

**Raleigh Priester:**

60)        On February 6, 2012 Raleigh Priester, a United States Army veteran, who had battled severe mental health problems, including schizophrenia, for over two decades was arrested for throwing a rock at a City of Fort Lauderdale employee who had asked him to vacate a city parking garage. According to booking records from the Broward County Jail Mr. Priester was 6 foot 2 inches tall and weighed 240 pounds the day he was arrested. When Mr. Priester was found dead in his isolation cell on July 10, 2012, 155 days after his arrest, he weighed only 120 pounds  For 155 days, numerous employees,  from both the Broward County Sheriff's Office and Armor Correctional Healthcare, including Defendants FRANKOWITZ and MARTIN, stood by and watched as Mr. Priester, who was continuously locked in solitary confinement, without any type of medication or medical treatment for his serious medical and mental health conditions, slowly died from starvation.

61)        From February 12, 2012 to March 14, 2012, Raleigh Priester was kept in isolation and both ARMOR'S and SHERIFF'S employees' including Defendants FRANKOWITZ and MARTIN observed Priester consistently standing in cell naked, yelling incoherently, actively hallucinating, banging his head into the floor causing himself to bleed and having difficulty walking. No ARMOR employee attempted to treat Priester's serious medical conditions in any way.

62)     On March 15, 2012, Defendant MARTIN, signed off on a "Medical Clearance of Baker Act" for Priester.  This document was completed by ARMOR Mental Health Counselor, Cynthia Sanon.  Ms. Sanon found that Priester suffered from a mental illness and that because of this mental illness,

> "without care and treatment PRIESTER is likely to suffer from neglect or refuse to care for himself, and that such neglect or refusal poses a real and present threat of substantial harm to his well-being and there is a substantial likelihood that without care or treatment PRIESTER will cause serious bodily harm to himself in the near future, as evidenced by recent behaviors".

As supporting evidence for the above findings Ms. Sanon documented that Priester is "disheveled, responding to internal stimuli, mute and unable to determine the necessity for mental health treatment and he exhibits a decrease in appetite and poor self-care". On March 15, 2012 Ms. Sanon wrote down that Priester weighed 220 pounds.

63)     From March 16 to May 21, 2012, Priester remained in solitary confinement, untreated and without any type of medication. On a daily basis Priester was observed by ARMOR'S and SHERIFF'S employees including Defendant FRANKOWITZ and MARTIN.  During this time period his jail medical records reflect the following: PRIESTER was constantly mumbling to himself; he was suffering from a urinary tract infection, which was never treated, as evidenced by "bright red urine" on the cell floor for weeks; PRIESTER was bleeding from unknown origin as evidenced by blood on the cell floor; PRIESTER was lying for weeks at time in a fetal position on the cell floor; PRIESTER'S feet were ulcerated and infected for weeks; PRIESTER became so weak that he could not sit up or stand to put on his pants without assistance; PRIESTER became so weak that he could not eat or drink without assistance.

64)        On May 21, 2012, Christopher Fichera, a clinical and forensic Psychologist, was sent by Broward Circuit Court Judge Raag Singhal to evaluate whether Priester was competent to proceed in the ongoing criminal case.  Mr. Fichera found that Priester was "suffering with significant symptoms of physical decomposition" including "acute hypotension and dehydration" to the point that Priester was unable to appreciate the purpose of the evaluation.  As part of his evaluation Mr. Fichera  interviewed the nurse on duty, an ARMOR employee, who stated that Priester was  not able to follow simple commands and that she "has been attempting to give him water with a syringe, and that he is able to swallow only small amounts of this." Said nurse stated, "that Priester has not been given a medical diagnosis and was not on any medications."

65)        On May 21, 2012, Mr. Fichera interviewed Defendant MARTIN who stated that, "Priester has been essentially non-responsive and has not been eating or drinking and for those reasons he has become dehydrated."

66)        On May 22, 2012, Priester was found unresponsive on the floor of his isolation cell. Defendant FRANKOWITZ was notified and approved the transfer of Priester to North Broward Medical Center (NBMC).

67)        Upon intake at NBMC Priester was placed on a ventilator and taken to the Intensive Care Unit.

68)        On May 22, 2012, at NBMC PRIESTER weighed 139 pounds, 101 pounds less than the day he was arrested.  Priester was diagnosed as being hypotensive with a blood pressure of 94/40, malnourished, dehydrated, septic, and suffering from bilateral pneumonia.  His treating physician stated his condition was extremely critical.

69)        Realizing that Priester was gravely ill and malnourished the medical staff at

19

NBMC consulted a dietitian who prescribed a high calorie diet.    <u>By May 25, 2012,</u>
<u>Priester, with proper nutrition, gained 11 pounds and his weight rose to 151 pounds</u>

70)        Priester stayed at NBMC from May 22 to May 29, 2012.  During that time he
was treated for his many serious medical conditions including various infections of his
blood, lungs and feet.  He was also prescribed several medications for his serious
physical conditions and mental health conditions.

71)        On May 29, 2012, Priester was discharged from NBMC back to the Broward
County Jail with specific instructions to the jail regarding Priester's continuation of care
for his diagnosed serious medical conditions.

72)        From May 29, to June 25, 2012, Priester was returned back to solitary
confinement and employees of ISRAEL and ARMOR, including Defendants
FRANKOWITZ and MARTIN, failed to provide him with any of the medication ordered
by NBMC and then they all stood by and watched as he slowly died. According to
Priester's jail medical records during this time he was observed being agitated,
non-verbal, talking to himself, urinating and defecating everywhere except the toilet and
being in obvious medical crisis.

73)        On July 10, 2012, Priester was found dead on the floor of his solitary
confinement cell. **He weighed 120 pounds.**  In 155 days Priester's weight had dropped
from 240 pounds to 120 pounds.

74)        The death of Raleigh Priester formed the basis of Case number
14-61577-Civ-Bloom/Valle, a federal civil rights lawsuit filed in the Southern District of
Florida.  As part of said lawsuit Plaintiff's expert witness, Dr. Arthur Fournier, Professor
Emeritus at the University Of Miami School Of Medicine, authored a 12 page expert

witness report.   (Attached as Ex. 1).   As part of his report Dr. Fournier gave the following opinion relating to the care provided to both Mr. Priester and another inmate who died three days before Priester named Arthur Sacco:

> Opinion 6:  Mr. Priester's preventable death is but one example of what appears to be a pattern of willful neglect and a refusal to send inmates to outside hospitals for care when that care is medically necessary to treat inmates with medical and mental illness who are under the care of Armor Health Services.

75)      As the basis for Opinion 6 Doctor Fournier stated the following:

> Mr.  Sacco's death was totally preventable and his death was caused by the same failures seen in Mr. Priester's case. Specifically, Armor's personnel and Defendant Frankowitz failed to treat an objectively obvious serious medical condition and delayed Mr. Sacco's transfer to a hospital even when the need to transfer Mr. Sacco was obvious.  Mr. Sacco's medical condition took days to develop and if he had been properly treated and transferred to the hospital without unnecessary delay he would not have died. Defendant Frankowitz's and Armor's other medical professionals' failure to treat and transfer Mr. Sacco to a hospital is grossly contrary to accepted medical practices and caused Mr. Sacco extreme pain and caused his death. Likewise, the delay in sending Mr. Priester to the hospital in the weeks and months before he was found unresponsive on the cell floor on May 22, 2012, was an unnecessary delay without medical justification as it was obvious to any medical professional that Mr. Priester needed hospitalization long before he became so sick that he had to be fed Ensure through a bulb syringe.

**Arthur Sacco:**

76)      On June 21, 2012, Mr. Sacco, was brought to Memorial Regional  Hospital as a Baker Act because he was intoxicated and had voiced a desire to end his own life.  Sacco went through the withdrawal process without difficulty at the hospital and then because he was brought to the hospital in police custody he was released to the police once the hospital determined he was medically stable.  Once he was released from the hospital Sacco was transported directly to the Broward County Jail where he was booked in on June 25, 2012.

77)     On June 27, 2012, Defendant FRANKOWITZ met with Sacco, evaluated him and conducted a history and physical.   In his history and physical Defendant FRANKOWITZ recorded that Sacco was a 52 year old white male with a mental health history including several past Baker Acts, a prior major spinal surgery and a gastric bypass surgery in 2008.  Defendant FRANKOWITZ did not find any current physical ailments or current serious medical conditions during the examination on June 27, 2012.

78)     On June 29, 2012, Defendant FRANKOWITZ again evaluated Sacco and this time he recorded that Sacco was vomiting, suffering from severe back pain, and that his blood pressure had increased.

79)     On July 4, 2012, at 7:15 A.M. ARMOR employee, Lashanta Rufus, LPN was contacted by a Sheriff's Deputy and was told that Sacco was vomiting and had diarrhea.  The Deputy reported that Sacco was too weak to hold himself up.  ARMOR employee Rufus recorded that Sacco was dry heaving and had a constant flow of diarrhea.  A Sheriff's Office Sergeant ordered that Sacco be moved to the infirmary. Then, with the help of staff, Sacco was showered to remove the vomit and diarrhea and was put into a diaper.

80)     On July 4, 2012 at 3:10 P.M. ARMOR employee LPN Saint-Louis documented that while she was distributing medication, Sacco was unable to stand without help.  At this point a Sheriff's Office Deputy requested that ARMOR move Sacco to Unit 1F5, which is a medical placement for critically ill inmates, as soon as possible.

81)     On July 4, 2012 at 9:30 P.M. ARMOR employee LPN Warner recorded in Sacco's medical chart that he was unable to stand on his own.  Therefore, a mattress was

placed on the floor and because he was physically unable to change his own diaper, his diaper is changed for him. At this point ARMOR medical personnel including Defendant FRANKOWITZ were fully aware that Sacco was critically ill and needed to be transported to the hospital.  However, they failed to have him moved to a hospital or provide more intensive treatment within the jail.

82)     On July 5, 2012, at 1:00 PM, Sacco was again seen by Defendant FRANKOWITZ who recorded that the day before Sacco had been found by Sheriff's Deputies in his cell covered in emesis (vomit) and diarrhea.  Defendant FRANKOWITZ documented that Sacco was very frail, his tongue was dry and he had poor skin turgor (a sign of severe dehydration).  At this point Defendant FRANKOWITZ knew that Sacco was critically ill and needed to be moved to an outside hospital for treatment.  However, Defendant FRANKOWITZ deliberately ignored the clear signs of a medical emergency and failed to move Sacco to a hospital for treatment.

83)     On July 5, 2012, at 1:45 P.M. Sacco was evaluated by ARMOR employee Sylvain LPN who found Sacco laying on a mat and only able to mumble a few words. She recorded that Sacco, still in a diaper, was so weak that he was unable to hold a cup or water or food to his mouth without assistance.

84)     On July 5, 2012, at 4:30 P.M. Sacco was evaluated by ARMOR employee nurse Janis who found Sacco so severely ill that she was only able to arouse him with a deep sternum rub – (a deep sternum rub is what is used when an individual is unconscious and unable to be aroused by other methods).  Nurse Janis recorded that Sacco was dehydrated and his skin was dry and warm.  Defendant FRANKOWITZ was

contacted and apprised of the situation.  At this point Sacco had been in a diaper and unable to stand on his own for over 30 hours and his condition was rapidly deteriorating. This was clearly a medical emergency and there was no medical justification for not sending him to the hospital.  If he had been sent to a hospital even at this late time, his medical condition would have been diagnosed, treated and Sacco would not have died. However, Defendant FRANKOWITZ and the rest of ARMOR'S medical employees failed to transfer Sacco to the hospital.

85)      On July 6, 2012, at 1:30 A.M. ARMOR employee nurse Monical recorded that Sacco was medically critical and in a state of shock.  She recorded in her notes that Sacco was totally unresponsive and only opened his eyes slightly when she moved him so that she could take his vital signs.  Nurse Monical was not able to take Sacco's temperature because Sacco was unable to close his mouth around the thermometer. There was no medical justification for failing to transport Sacco to a hospital where he could be properly treated for his serious medical conditions.

86)      Through the early morning hours of July 6, 2012, Sacco was kept on IV fluids and the amount was increased because he was not responding.  He was deteriorating and needed hospitalization.

87)      On July 6, 2012, at 10:00 AM, Defendant FRANKOWITZ again saw Sacco. Defendant FRANKOWITZ recorded that Sacco could only be aroused with a sternum rub, that Sacco had been on an IV for 18 hours and was still medically critical.

88)      Six hours later, on July 6, 2012 at 4:00 PM Defendant FRANKOWITZ recorded in Sacco's medical chart that the lab results showed that Sacco was in shock and

that a medical emergency existed.  The results as recorded by Defendant FRANKOWITZ showed that Sacco's blood urea nitrogen levels had increased from 13 mg/dL (normal) on June 26th to 108 mg/dL.  This increase indicated life threatening dehydration or kidney failure.  Based on these findings Defendant FRANKOWITZ wrote in Sacco's medical chart that the labs confirmed that Sacco was severely dehydrated and his blood urea nitrogen was extremely high.  Defendant FRANKOWITZ put a star next to the words "severe dehydration" in his handwritten notes.  Defendant FRANKOWITZ then wrote that Sacco was already on an IV underlining the words, "already on an IV", indicating that he realized that the IV was not stabilizing Sacco.  Defendant FRANKOWITZ also recorded that Sacco's white blood count (WBC) was 21,900 mm³.  A WBC of 11,000 mm³ or higher suggests an acute bacterial infection.  Sacco also had a fever of almost 101.  The blood urea nitrogen indicated severe life threatening dehydration and the WBC and fever suggested that he had an infection.  His clinical deterioration together with the laboratory results indicated infection plus dehydration and constituted a medical emergency that required immediate hospitalization. Still, Defendant FRANKOWITZ failed to have Sacco transported to the hospital.

89)     On July 6, 2012, at 6:30 PM ARMOR employee nurse Janis inserted a Foley catheter into Sacco's penis.  Sacco, according to Nurse Janis' notes, was not verbally responsive, but moaned at times.

90)     Then on July 6, 2012, at 11:00 PM a Sheriff's Deputy was conducting a head count of inmates when he noticed Sacco was totally unresponsive in his cell. The Deputy contacted ARMOR employee nurse Monical, who does not have the authority to send an

inmate to the hospital on her own so she called ARMOR physician, Doctor Hoffman, who approved the transfer of Sacco to the hospital. Nurse Monical called EMS about two hours after she was contacted by the concerned Deputy and EMS arrived at 1:04 AM on July 7, 2012.

91)     Based on Sacco's hospital records when he arrived in the emergency room he was quickly diagnosed as being in septic shock. A CT scan revealed a perforated bowel. As he was being prepped for surgery, he coded and was pronounced dead at 8:47 AM on July 7, 2012.

92)     Sacco's death was preventable. He would not have died if ARMOR'S medical personnel, including Defendant FRANKOWITZ had transported Mr. Sacco to the hospital without the medically unjustified delay.

93)     An autopsy was conducted and the cause of death was identified as sepsis due to a perforated diverticulum. The doctor who did the autopsy found 900 milliliters of fecal material in Sacco's abdominal cavity, 100 milliliters of straw colored fluid within the right pleural cavity and 200 milliliters of straw colored fluid in the left pleural cavity.

94)     After Sacco's death ARMOR completed a three page "Mortality or Morbidity Review" that evaluated the care provided to Sacco by ARMOR. According to ARMOR'S own review, Sacco was admitted to the infirmary on July 3, 2012 for vomiting, diarrhea and severe dehydration. Sacco had an elevated WBC count and temperature of 100.8. ARMOR'S own conclusion was that, **"perhaps he [SACCO] could have been sent sooner to the hospital"**.

95)     The medical care of Sacco and the "Mortality or Morbidity Review" was

26

discussed at meeting held on July 19, 2012.  This meeting was attended by ARMOR'S medical director, regional vice president, director of nursing, health services administrator and five other high-ranking ARMOR employees.  Therefore, ARMOR was aware of the constitutional deficiencies in the care of Sacco and even with this knowledge failed to make any changes that would prevent this type of unnecessary death in the future.

### The Contract and the Money

96)     On or about December 16, 2009, a contract, for a five year term, was entered into between Broward Sheriff Al Lamberti, Defendant ISRAEL'S predecessor, and Defendant ARMOR through its President Jose Armas for the purpose of providing comprehensive healthcare services for all inmates of the Broward County jail facilities.

97)     In the contract ARMOR agreed to accept $25,163,410.00 per year to Provide "comprehensive medical, mental health, dental and related healthcare services for individuals incarcerated in any of the Broward Sheriff's Office Detention Facilities."

98)     The $25,163,410.00 per year that ARMOR agreed to accept is a set amount. Therefore, the only way that ARMOR, a for-profit corporation, can make a profit is to spend less than $25,163,410.00 per year on the healthcare of inmates within the Broward County Jail.

99)     The contract between ARMOR and ISRAEL creates a powerful financial disincentive for ARMOR to send seriously ill inmates to an outside healthcare provider, such as a hospital, for treatment, as the contract states that ARMOR is responsible for all costs associated with the treatment of any inmate at an outside facility up to the total cost to the outside facility or fifty thousand dollars ($50,000.00) per inmate, per occurrence.

27

100)        ARMOR and Defendant ISRAEL, who is ARMOR'S employer, both profit by not sending inmates to outside hospitals for care.  ARMOR, per the contract entered into with Defendant ISRAEL, is responsible for the first $50,000.00 in healthcare costs billed by any outside hospital.  This $50,000.00 is on a per inmate basis so each inmate sent to an outside hospital for care could cost ARMOR up to $50,000.00.  Any amount over the first $50,000.00, per inmate, is paid by Defendant ISRAEL. Any money that ARMOR has to spend on outside medical care comes directly out of the flat fee that Defendant ISRAEL pays ARMOR to provide medical care within the jail and therefore decreases ARMOR'S profits. Any amount over the first $50,000.00 for hospital care is paid by Defendant ISRAEL. Therefore, ARMOR benefits in two way by not sending inmates to the hospital:

    a.        First, ARMOR avoids paying the hospital bill up to the cap of $50,000.00.

    b.        Second, ARMOR protects its employer, Defendant ISRAEL, who is already paying ARMOR about 25 million dollars per year to provide medical care, from additional healthcare costs coming from outside hospitals.

101)        ARMOR'S strategy of providing unconstitutional healthcare and not sending inmates to the hospital for care worked well enough that Jose Armas, the owner of 100% of ARMOR'S stock, was able to personally take a shareholder distribution of $2,382,893.00 and $7,219,698.00, in 2012 and 2013, respectively.

## The Consent Decree

102)        The Sheriff of Broward County and the Plaintiffs in the Carruthers class action entered into the Stipulation for Entry of Consent Decree on July 27, 1994 (the "Consent Decree"), which was then ratified and confirmed by Judge Hoeveler on January 31, 1995.

On June 7, 1995, Judge Hoeveler issued an amended Order incorporating the settlement agreement of the parties. (Case 76-cv-06086-DMM).

103) The Consent Decree acknowledged that conditions of confinement had been determined to be unconstitutional and provided that all Broward County correctional facilities would be operated and maintained, at a minimum, by applying the most stringent provisions of applicable federal and Florida law and the standards set forth in Chapter 33-8 of the Florida Administrative Code, the American Correctional Association Standards for Adult Local Detention Facilities, and the National Commission on Correctional Healthcare Standards of medical, dental and mental health services. Consent Decree at pg. 2, ¶ 4; pg. 4, at ¶ 10.

104) The Consent Decree requires the Jail to provide mental healthcare consistent with "applicable federal law" and with the Florida Administrative Code, and the standards from the National Commission of Correctional Healthcare (NCCHC). The Due Process Clause requires the Jail to adequately and timely treat pretrial detainees' serious mental health conditions.

105) During his tenure, the Court's mental health expert Dr. Metzner documented a series of systemic problems in the Jail's mental healthcare system, particularly its failure to treat the acutely and chronically mentally ill. *See, e.g.,* Metzner IV at 17, 31, 36-38, 41-42 (noting ongoing problems with the initiation of psychotropic medications after admission, the mental health sick call process, access problems to psychiatric hospitalization, untimely provider involvement for actively psychotic prisoners, and inadequate treatment for prisoners refusing medications.)

106) The consent decree is still in force and the above listed failures have never

29

been corrected although the ISRAEL, ARMOR, FRANKOWITZ and MARTIN have been aware of the problems for over a decade.

107) Defendants ISRAEL, ARMOR, FRANKOWITZ, and MARTIN each had a duty to ensure that reasonable measures were taken to provide for the safety of inmates at the Broward County Jail facility.

108) All Defendants were on notice of the unconstitutional conditions in the Broward County Jail facilities, and the problems found by doctor Metzner when he examined the jails as part of the Consent decree and each failed to rectify these conditions.

109) The above acts and omissions of all Defendants, and each of them, constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety and welfare of the Plaintiff HERRING and those similarly situated, resulting in the deprivation of his/their constitutional rights.

110) Federal and state law, as well as accepted corrections and medical practices at the time of the incident, provided "fair warning" to Defendants that their conduct was improper, incompetent, illegal and in violation of the Plaintiff's constitutional rights.

111) The acts and omissions of the Defendants, as set forth above, violated clearly established and well settled federal constitutional rights of the Plaintiff HERRING, i.e., due process of law under the Fourteenth Amendment, and cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

112) As a direct and proximate result of the acts and omissions of the Defendants as set forth above, the Plaintiff HERRING suffered the following injuries and damages:

     a) Violation of his constitutional rights under the and Fourteenth Amendment to

the United States Constitution;

b)     Loss of his life.

## COUNT  I
## 42  U.S.C.  §1983  CLAIM - DEFENDANT ARMOR CORRECTIONAL HEALTH SERVICES, INC.

113)     The Plaintiff reallege paragraphs 1-9, 12-112.

114)     In  the  24  months  prior  to  HERRING'S death  ARMOR  collected about  $50,000,000.00  of  taxpayer  money  from  Defendant  ISRAEL  to  provide comprehensive healthcare (including constitutionally required healthcare) to all inmates in  the  Broward  County  Jail  system  that  is  operated  and  supervised  by  Defendant ISRAEL.

115)     During this 24 month period ARMOR was aware that its doctors and nurses had been deliberately indifferent to the serious medical conditions of William Campbell, Gary Smith, Calvin Goldsmith, Arthur Sacco, and Raleigh Priester and that by ignoring their serious medical conditions these men had died horrible and preventable deaths.

116)     ARMOR, having knowledge of these prior horrible and preventable deaths, along  with  many  other  poor  health  outcomes  caused  by  their  employees'  deliberate indifference to the serious medical conditions of pretrial detainees, failed to remedy the longstanding custom of medical neglect and failure to send critically ill individuals to outside  hospitals  without  any  medically  unjustified  delay  and  therefore  made  it foreseeable and certain that others, such as HERRING, would be harmed and die from ARMOR'S unconstitutional medical neglect.

31

117)      Defendant ARMOR had a duty to train, supervise, control or otherwise ensure that the doctors and nurses under its control, including, but not limited to, Defendants FRANKOWITZ and MARTIN, did not violate the constitutional rights of persons such as the Plaintiff HERRING.

118)      At all times materials hereto, Defendant ARMOR was responsible for adopting and implementing the rules and regulations in regard to hiring, screening, training, supervising, controlling, disciplining and assigning nurses and doctors to their duties prescribed by the contract they entered into with Defendant ISRAEL to provide comprehensive health and assessment services for inmates within the Broward County Jail System.

119)      Said Defendant failed to comply with these obligations, as its employees, Defendants FRANKOWITZ, MARTIN and others breached their duties by failing to, assess, monitor, medicate, hydrate, diagnosis, treat HERRING and/or have him transferred to an outside hospital without any medically unjustified delay.

120)      Defendant ARMOR failed to properly train and/or supervise its nurses and doctors in the screening, assessment, treatment, care and monitoring and/or supervision of pretrial detainees.  Its doctors and nurse demonstrated deliberate indifference to the health and well-being of inmates such as the Plaintiff HERRING, by failing to conduct appropriate health screening, assessments, treatment, care, monitoring, medication, supervision and transfer to local hospitals without any medically unjustified delay. Said failure resulted in HERRING being neglected until he died.

121)      Defendant ARMOR, through its employees, has exhibited its deliberate

indifference to the unacceptable medical care that has resulted in the horrible and preventable deaths of: William Campbell, Gary Smith, Calvin Goldsmith, Arthur Sacco, and Raleigh Priester and has maintained a system of review of the treatment of pre-trial detainees which has failed to identify the improper treatment by the nurses and doctors, and failed to subject nurses and doctors who improperly treat pre-trial detainees to appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become the de facto policy and custom of said Defendant to tolerate the improper treatment of ill pre-trial detainees at the Broward County Jail System.

122)      Defendant ARMOR, a for-profit company, has intentionally engaged in a practice of not sending inmates to outside medical providers for treatment even when outside care is absolutely medically necessary because the cost of sending inmates to an outside medical provider costs ARMOR money that decreases their profits.

123)      Defendant ARMOR has adopted written policies and unwritten customs that are deliberately indifferent to the needs of mentally ill inmates and has caused many inmates to go without needed medication.  The result of allowing severely mentally ill inmates to go without necessary anti-psychotic medication is that at least two of them have starved themselves to death and countless others have been harmed because they failed to care for themselves and/or were unable to adequately convey the severity of their medical issues healthcare providers.

124)      Defendant ARMOR has acted with deliberate indifference to the needs of the inmates in Broward by failing to implement any policy or custom that would address the needs of unmedicated mentally ill inmates, inmates who refuse medication for their

mental illness and inmates who are in need of outside hospitalization for mental health reasons but are not able to be Baker Acted.

125)     Defendant ARMOR acted in reckless disregard of both constitutional prohibitions and guarantees under color of state law, thereby misusing the power possessed by virtue of state law and made possible only because said Defendants were clothed with the authority of state law.

126)     The Plaintiff HERRING has been a victim of the above mentioned illegal treatment of pre-trial detainees and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of said Defendant.

127)     The deliberate indifference of this Defendant violated the constitutional rights of all persons, including the Plaintiff, for which 42 U.S.C. § 1983 provides a remedy.

128)     Plaintiff HERRING suffered a horrible, painful and preventable death as a result of ARMOR'S actions.

**WHEREFORE**, the estate of HERRING on behalf of his mother and father, Kathryn Kaether and William Herring, Sr., demands compensatory and punitive damages against Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC., attorney fees, costs, and trial by jury for all issues so triable by right.

## <u>COUNT II -- 42 U.S.C. § 1983 CLAIM - DEFENDANT ISRAEL</u>

129)     The Plaintiff realleges paragraphs 1-8, 12-112.

130)     Defendant ISRAEL, as the Chief Correctional Officer, appointed by the Broward County Board of County Commissioners, had a duty to train, supervise, control

and otherwise ensure that Defendants ARMOR and ARMOR'S employees, including, but not limited to FRANKOWITZ and MARTIN did not violate the constitutional rights of persons such as the Plaintiff HERRING. Said Defendant abdicated his policymaking and oversight responsibilities, thereby allowing and making foreseeable the incident nvolving the Plaintiff to occur.

131)     Defendant ISRAEL, knew or should have known: (1) of the ARMOR reports demonstrating a failure of both corrections and medical staff to properly assess and treat inmate's serious medical conditions and to have them transferred to outside hospitals when it was clearly medically necessary; (2) preventable poor health outcomes of inmates and deaths that resulted from improper treatment and neglect; (3) that corrections deputies were not trained with respect to the care and custody of seriously medically ill inmates; (4) that investigations into incidents of inmate neglect and poor medical outcomes including death were incompetent and failed to address the misconduct of the ARMOR employees and/or corrections officers, with the foreseeable result being the creation of circumstances that resulted in the neglect and death of the Plaintiff HERRING.

132)     At all times material hereto, Defendant ISRAEL was responsible for adopting and implementing the rules and regulations in regard to hiring, screening, training, supervising, controlling, disciplining and assigning deputies and/or corrections officers and/or employees and/or contractors such as ARMOR to their duties within the Broward County Sheriff's Office.

133)     At all times material hereto, Defendant ISRAEL was responsible for adopting

and implementing rules and regulations with regard to assessment, medical treatment, housing, and monitoring of pre-trial detainees.

134)     Said Defendant was deliberately indifferent to his duties in that he either expressly or impliedly acknowledged and assented to the failure to train, supervise, control or otherwise screen employees of the Broward County Sheriff's Office, including but not limited to Defendants ARMOR, FRANKOWITZ and MARTN for dangerous propensities, lack of training and/or skill or other characteristics making said officers and employees unfit to perform their duties at the Broward County Jail facilities.

135)     Defendant ISRAEL was aware of the problems and conditions existing  in the Broward County Jail System, such as the horrible and preventable deaths of William Campbell, Gary Joseph, Calvin Goldsmith, Arthur Sacco and Raleigh Priester and other deaths and injuries that resulted from inadequate manpower, poor monitoring, improper medical classification, improper medical screening, improper medical assessment, unacceptable medical care of inmates, including failing to send critically ill inmates to outside hospitals without any medically unjustified delay.

136)     Defendant ISRAEL was deliberately indifferent to the safety of the inmates by failing to remedy these problems, even though he had notice of them.

137)     Defendant ISRAEL'S deliberate indifference to these problems caused a substantial risk of harm to the Plaintiff and other inmates housed in Broward County Jail facilities.

138)     Defendant ISRAEL, despite clear warnings, has failed to properly train, and/or supervise his deputies and/or corrections officers and/or employees and/or agents in the

treatment, care, and housing of pre-trial detainees.

139)     The conduct of Defendant ISRAEL in his failure to train, supervise and/or discipline his deputies and/or corrections officers and/or agents and/or employees, including ARMOR and ARMOR's employees, was deliberately indifferent to the constitutional rights of all persons, including the Plaintiff HERRING.

140)     Defendant              ISRAEL        abdicated        his      policymaking        and oversight responsibilities, thereby allowing the deputy sheriffs/corrections officers and/or agents and/or employees to ignore the requirements of law and the policies of the Broward Sheriff's Office.

141)     The Defendant ISRAEL has maintained a system of review of the treatment and care of pretrial detainees, and complaints thereof, which has failed to identify the improper treatment and neglect by his officers and/or agents and/or employees and to subject officers and/or agents and/or employees who fail to properly classify, monitor, treat, assess, medicate, protect, hydrate and house pre-trial detainees to appropriate discipline, supervision, dismissal and/or retraining, to the extent that it has become a de facto policy and custom of Defendant ISRAEL to tolerate the improper treatment and neglect of ill pretrial detainees such as HERRING.

142)     The foregoing acts, omissions, policies or customs of Defendant ISRAEL caused deputies and/or corrections officers and/or agents and/or employees to believe there exists no meaningful duty to properly classify, monitor, treat, assess, medicate, protect, hydrate and house pre-trial detainees, with the foreseeable result that deputies and/or corrections officers and/or agents and/or employees are likely to ignore the needs of the ill pre-trial detainees and endanger the safety and lives of inmates such as

HERRING, thereby risking their safety and continued life by neglecting them.

143)     The deliberate indifference of this Defendant violated the constitutional rights of all persons, including the Plaintiff, for which 42 U.S.C. §1983 provides a remedy.

144)     The above acts and omissions of Defendant ISRAEL constitute a course of conduct and failure to act amounting to deliberate indifference to the rights, health, safety and welfare of the Plaintiff and those similarly situated, resulting in the deprivation of the Plaintiff's constitutional rights under federal law.

145)     The Plaintiff HERRING has been a victim of the above-mentioned illegal treatment of pre-trial detainees and said illegal treatment was the direct result of the previously described acts, omissions, policies or customs of Defendant ISRAEL.

146)     As a direct and proximate cause of the acts described above, the Plaintiff HERRING died a preventable and horrible death.

**WHEREFORE**, the estate of HERRING on behalf of his mother and father, Kathryn Kaether and William Herring, Sr., demands compensatory damages against Defendant ISRAEL, attorney fees, costs, and trial by jury for all issues so triable by right.

### <u>COUNT III -- 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT FRANKOWITZ</u>

147)     The Plaintiffs reallege paragraphs 1-7, 10, 12-95, 99-112.

148)     At all times material hereto, the Defendant FRANKOWITZ, as an ARMOR doctor and HERRING'S primary doctor was responsible for the medical and mental healthcare provided to HERRING. This medical and mental healthcare included monitoring HERRING as his health deteriorated, diagnosing HERRING'S serious medical conditions, treating HERRING'S serious medical conditions and transferring

38

HERRING to a hospital when it became clear that HERRING was in urgent need of hospitalization.

149)     Defendant FRANKOWITZ was acting under color of state law as an employee of Defendant ARMOR when he subjected HERRING to the deprivation of rights and privileges secured to him under the Fourteenth Amendments to the United States Constitution.

150)     The slow and preventable death of HERRING was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate medical and mental healthcare and to transfer HERRING to the hospital without any medically unjustified delay.

151)     Based on ARMOR'S own records and reports regarding the deaths of William Campbell, Gary Joseph, Calvin Goldsmith, Arthur Sacco, Raleigh Priester and others, Defendant FRANKOWITZ was on notice that prior inmates under his care had died as a result of his deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

152)     This Defendant breached the duty of care that he owed to HERRING by failing to assess, medicate, treat, monitor and have HERRING sent to a hospital for care, despite his notice and knowledge of HERRING'S serious mental health and medical conditions and need of hospitalization.

153)     The deliberate indifference of this Defendant violated the constitutional rights of the Plaintiff HERRING, for which 42 U.S.C. §1983 provides a remedy.

154)     As a direct and proximate result of the violation of the Plaintiff HERRING'S

constitutional rights by Defendant FRANKOWITZ, HERRING suffered a horrible and totally preventable death.

**WHEREFORE**, the estate of HERRING on behalf of his mother and father, Kathryn Kaether and William Herring, Sr., demands compensatory and punitive damages against Defendant FRANKOWITZ, attorney fees, costs, and trial by jury for all issues so triable by right.

### COUNT IV -- 42 U.S.C. §1983 CLAIM AGAINST DEFENDANT MARTIN

155)      The Plaintiffs reallege paragraphs 1-7, 11-95, 99-112.

156)      At all times material hereto, the Defendant MARTIN, was an ARMOR doctor employed as a psychiatrist and was HERRING'S primary doctor responsible for the mental health and medical care provided to HERRING. This mental health and medical care included monitoring HERRING as his health deteriorated, diagnosing HERRING'S serious medical conditions, treating HERRING'S serious medical conditions and transferring HERRING to a hospital when it became clear that HERRING was in urgent need of hospitalization.

157)      Defendant MARTIN was acting under color of state law as an employee of Defendant ARMOR when he subjected HERRING to the deprivation of rights and privileges secured to him under the Fourteenth Amendments to the United States Constitution.

158)      The slow and preventable death of HERRING was a reasonably foreseeable consequence of this Defendant's deliberate indifference to his obligation to provide appropriate mental health and medical care and to transfer HERRING to the hospital

without any medically unjustified delay.

159)     Based on ARMOR'S own records and reports regarding the deaths of William Campbell, Gary Joseph, Calvin Goldsmith, Arthur Sacco, Raleigh Priester and others, Defendant MARTIN was on notice that prior inmates under his care had died as a result of his deliberate indifference to their serious mental health and medical conditions and not transferring them to outside hospitals without any unjustified delay.

160)     This Defendant breached the duty of care that he owed to HERRING by failing to assess, medicate, treat, monitor and have HERRING sent to a hospital for care, despite his notice and knowledge of HERRING'S serious mental health and medical conditions and need of hospitalization.

161)     The deliberate indifference of this Defendant violated the constitutional rights of the Plaintiff HERRING, for which 42 U.S.C. §1983 provides a remedy.

162)     As a direct and proximate result of the violation of the HERRING'S constitutional rights by Defendant MARTIN, HERRING suffered a horrible and totally preventable death.

**WHEREFORE**, the estate of HERRING on behalf of his mother and father, Kathryn Kaether and William Herring, Sr., demands compensatory and punitive damages against Defendant MARTIN, attorney fees, costs, and trial by jury for all issues so triable by right.

Dated: 12/15/2016

Respectfully submitted,

ATTORNEYS FOR PLAINTIFF

Greg Lauer, Esq.

Lauer & Currie, P.A.

644 Se 5 Avenue

Fort Lauderdale, Fl 33301

Phone:(954) 533-4498

Facsimile:(954) 533-4501

By:      S/Greg M. Lauer

Greg M. Lauer

Fla. Bar No. 652709

*greg@law-lc.com*


By: S/Christina M. Currie

Christina M. Currie

Fla. Bar No. 90987

*cmc@law-lc.com*